IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| **ANTONIO MAURICE SCOTT, As Personal Representative of the Estate of GEORGE BYNUM,**<br><br>Plaintiff,<br><br>v.<br><br>**SIVA CHOCKALINGAM, M.D.; ASSOCIATES IN GASTROENTEROLOGY, P.A.; BERKELEY ENDOSCOPY CENTER, L.L.C.; ROBERT SHARP, M.D., In His Individual Capacity as Agent, Servant, And/Or Employee of the South Carolina Department of Corrections, SOUTH CAROLINA DEPARTMENT OF CORRECTIONS,**<br><br>Defendants. | C/A No. 0:18-1102-RMG-PJG<br><br><br>**PLAINTIFFS RESPONSE IN OPPOSITION TO SECOND MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANT SOUTH CAROLINA DEPARTMENT OF CORRECTIONS** |

Plaintiff, Antonio Maurice Scott, as personal representative of the Estate of George Bynum, by and through his undersigned counsel, submits this Response in Opposition to Defendant South Carolina Department of Corrections Motion for Summary Judgment. Specifically Defendant SCDC argues: (1) SCDC is not a person within the meaning of the term as used in 42 U.S.C. ¶1983 and (2) Plaintiff's state claims for medical malpractice and gross negligence and for violations of standards of medical practice against Defendant SCDC should be dismissed, because Plaintiff failed to produce expert testimony to show that Defendant SCDC was negligent and grossly negligent and violated standards of medical practice in their care and treatment of George Bynum that are a proximate cause of George Bynum's injuries and death. Plaintiff opposes this Motion for the following reasons.

1

## STATEMENT OF FACTS

The South Carolina Department of Corrections ("SCDC") operates several correctional Institutions in South Carolina. Defendant. SCDC medical personnel are charged with providing adequate, timely, and proper medical care to inmates housed within SCDC (including the Plaintiff), monitoring and acting in compliance with all policies and procedures; overseeing the infirmary; enforcing rules, regulations, policies, and laws regarding medical care and employee conduct; and practicing within a proper system for the care and safety of inmates.

The decedent, George Bynum, was an inmate within the South Carolina Department of Corrections and was seen by SCDC medical staff throughout the years of 2012-2017. Mr. Bynum fist complained of troubling swallowing in October 2013. Mr. Bynum's pain got progressively worse and he continued to inform SCDC that his pain was progressing; however the insight he offered to SCDC as a patient was ignored and not timely acted upon. On or about October 10, 2014 he was still requesting to see a doctor regarding his symptoms. (See Pltf's Exhibit 1- Medical Encounters). Specifically on October 20, 2014, approximately a year from the initial complaint, Dr. Sharp signs off on a sick call visit and notes in his records "doctor's appointment non urgent" despite Mr. Bynum's continued complaints and failure to find relief. (See Pltf's Exhibit 1- Medical Encounters). After approximately a year with persistent complaints and requests to see a doctor, Mr. Bynum was finally seen by Dr. Sharp, a doctor employed by SCDC, on October 29, 2014. However during the timeframe prior to seeing Dr. Sharp, Dr. Sharp would frequently sign off on Mr. Bynum's medical record but would not physically see him. From June 2013 until October 29, 2014 Mr. Bynum continuously presented to sick call, complained of pain, and requested on multiple occasions to be assessed by a doctor. (See Pltf's Exhibit 1- Medical Encounters). Finally, one year and four months after initial

presentation Mr. Bynum is referred to a GI doctor, Dr. Chockalingam, by his cardiologist not by a SCDC doctor. (See Pltf's Exhibit 1- Medical Encounters). While seeing Dr. Chockalingam Mr. Bynum continues to request medical care at SCDC and it is noted he is still insistent on further care and is complaining of worsening pain with no signs of relief. (See Pltf's Exhibit 1- Medical Encounters). On or about December 17, 2014 it is noted that Mr. Bynum states "It is hard for me to swallow. What is the Dr. going to do for me?" (See Pltf's Exhibit 1- Medical Encounters).

Despite the persistent attempts, the Defendants continued to ignore Mr. Bynum's requests for medical help and failed to timely an properly treat him. Mr. Bynum was finally diagnosed with stage four esophageal cancer in June 2016, approximately three years after he first presents with complaints. Mr. Bynum passed away on April 11, 2018.

## LEGAL STANDARD

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. Brockbank v. Best Capital Corp., 341 S.C. 372, 534 S.E.2d 688 (2000); Moriarty v. Garden Sanctuary Church of God, 334 S.C. 150, 511 S.E.2d 699 (Ct. App. 1999), aff'd, 341 S.C. 320, 534 S.E.2d 672 (2000). "Because it is a drastic remedy, summary judgment should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues." Carolina Alliance for Fair Employment, 337 S.C. at 485, 523 S.E.2d at 799. Under Rule 56(c), SCRCP, the party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact. Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing, and Regulation, 337 S.C. 476, 523 S.E.2d 795 (Ct. App. 1999). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment. Summer v. Carpenter, 328 S.C. 36, 492 S.E.2d 55

3

(1997); Pye v. Aycock, 325 S.C. 426, 480 S.E.2d 455 (Ct. App. 1997). Because summary judgment is a drastic remedy, it must not be granted until the opposing party has had a "full and fair opportunity to complete discovery." Dawkins v. Fields, 354 S.C. 58, 69, 580 S.E.2d 433, 439 (2003); Lanham, 349 S.C. at 363, 563 S.E.2d at 334; Doe v. Batson, 345 S.C. 316, 322, 548 S.E.2d 854, 857 (2001); Baird v. Charleston County, 333 S.C. 519, 529, 511 S.E.2d 69, 74 (1999); Baughman v. American Tel. & Tel. Co., 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991)

As a general rule, the question of proximate cause is one of fact for the jury. Ballou v. Sigma Nu Gen. Fraternity, 291 S.C. 140, 352 S.E.2d 488 (Ct. App. 1986); see also Hadfield v. Gilchrist, 343 S.C. 88, 99, 538 S.E.2d 268, 274 (Ct. App. 2000) ("Proximate cause is a question for the finder of fact.") (citations omitted); Vinson v. Hartley, 324 S.C. 389, 402, 477 S.E.2d 715, 721 (Ct. App. 1996) ("Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence.") "Only in rare or exceptional cases may the question of proximate cause be decided as a matter of law." Ballou, 291 S.C. at 147, 352 S.E.2d at 493 (citation omitted); see also Small v. Pioneer Mach., Inc., 329 S.C. 448, 464, 494 S.E.2d 835, 843 (Ct. App. 1997)

### ARGUMENT

### I. PLAINTIFF DOES NOT ASSERT A 42 U.S.C. ¶1983 CLAIM AGAINST SCDC.

Defendants argue that if Plaintiff claims that Defendant SCDC was deliberately indifferent to George Bynum's health and safety, that Defendant SCDC should be dismissed from this Federal cause of action, because it is not a "person" or an individual subject to suit under 42 U.S.C. ¶1983. Plaintiff's Third Cause of Action in his Amended Complaint states that all 42 U.S.C. ¶1983 claims are against the individual Defendants only. (See Pltf.'s Compl. ¶32-41). Plaintiff

further clarifies that all 42 U.S.C ¶1983 are only against the individual defendants in this case and not SCDC.

    **II.    PLAINTIFF'S STATE CLAIMS FOR MEDICAL MALPRACTICE AND GROSS NEGLIGENCE AND FOR VIOLATIONS OF STANDARDS OF MEDICAL PRACTICE AGAINST DEFENDANT SCDC, AND ITS EMPLOYEES, SHOULD NOT BE DISMISSED BECAUSE PLAINTIFF HAS PRODUCED EVIDENCE TO SHOW THAT DEFENDANT SCDC AND ITS EMPLOYEES WERE NEGLIGENT AND GROSSLY NEGLIGENT AND VIOLATED STANDARDS OF MEDICAL PRACTICE IN THEIR CARE AND TREATMENT OF GEORGE BYNUM THAT ARE A PROXIMATE CAUSE OF GEORGE BYNUM'S INJURIES AND DEATH.**

The Defendants Motion for Summary Judgment must be denied, because contrary to the Defendants' arguments, there is ample evidence that Defendant SCDC deviated from the standard of care and those deviations caused Mr. Bynum's injuries. Thus there are several genuine issues of material fact which exist and summary judgment is improper.

First, Plaintiff's expert Dr. Eisner opines the following:

> " Mr. Bynum was complaining of pain with swallowing and heartburn since October 2013. Despite those complaints, and despite having charts signed off by SCDC physicians Dr. Amonitti and Dr. Sharpe, he was not seen by a physician, and not referred to GI until a cardiologist suggested the referral in October 2014. In fact, despite Mr. Bynum going to sick call multiple times with the same progressive complaints, Dr. Sharpe called his symptoms non-urgent. **The lack of a GI referral by the SCDC physicians and medical personnel before October 2014 was a significant delay, a deviation from the standard of care, and gross negligence.** Additionally, he was not seen by a SCDC physician from December 2014 until Jun 2015, and then again, despite a decline in his status, with ongoing symptoms related to painful and difficulty swallowing, he did not see an SCDC physician from September 2015 until March 2016."
>
> "In summary, a review of the records shows ….. medical personnel at SCDC deviated from the accepted standard of care, were grossly negligence….to Mr. Bynum's health."

(See Pltf.'s Exhibit 2- Dr. Eisner's Expert Report) (emphasis added).

Accordingly, contrary to Defendant SCDC's arguments, there is expert testimony that Defendant SCDC's significant delays in referring and treating Mr. Bynum, calling his clinical presentation

5

"non-urgent", and the several gaps of time of non treatment were deviations from the standard of care. Furthermore Plaintiff's second expert, Dr. Catenacci opines that due to these above failures Mr. Bynum's diagnosis was severally delayed and it caused his cancer to spread. (See Pltf.'s Exhibit 3- Dr. Catenacci's Expert Report).

Dr. Catenacci also gives opinions regarding the delay in care of Mr. Bynum. Specifically he states in his report: "Mr. Bynum was a man incarcerated at SCDC (South Carolina Department of Corrections). He began complaining of dysphagia (food getting stuck, problems swallowing)… and eventually after a long delay, he had an upper endoscopy…" Thus Dr. Catenacci also gives opinions regarding the delays on behalf of Defendant SCDC. Dr. Catenacci also opines that to a reasonable degree of medical certainty, the cancer of the esophagus was present prior to being ultimately identified. (See Pltf.'s Exhibit 3- Dr. Catenacci's Expert Report). Dr. Catenacci further clarifies:

> "If Mr. Bynum was diagnosed and treated at an earlier point in time, and therefore diagnosed at an earlier stage, his life expectancy would have been extended and his survivability would have been longer; In accordance with Dr. Eisner's opinions, had Mr. Bynum's cancer been caught in October 2013 or soon thereafter, Mr. Bynum more likely than not would have had a higher probability for long term survival and higher probability of cure. Mr. Bynum would have therefore been diagnosed at an earlier stage, instead of Stage IV, and he more likely than not would have had a higher probability of long term survival."
> " In summary should this esophageal cancer have been identified earlier at the time points above, the patient would have had improved survivability of his cancer…".

(See Exhibit 4- Dr Catenacci's Affidavit).

Therefore, Defendant SCDC's argument that <u>no</u> expert testimony regarding gross negligence for violations of the standard of care for medical negligence has been presented by the Plaintiff is incorrect.

Third, there is also deposition testimony from Dr. Chockalingam stating that the delays in Mr. Bynum's appointments, referrals, scheduling, and treatment were caused by Defendant SCDC:

> 1 Q Okay. Tell me about how the appointments would be
> 2 made for SCDC inmates. Would they be scheduled
> 3 through SCDC and you'd be notified, or are you
> 4 directly involved in the scheduling of appointments
> 5 for patients?
> 6 A The nurses at SCDC would schedule the appointments
> 7 and then they would inform us as far as who's
> 8 coming in on that particular day and that
> 9 information is entered into our computer.
>
> (Dr. Chockalingam Depo. 24:1-9) (Pltf.'s Exhibit 5)
>
> 9 Q Okay. Are you able to request to see a patient on
> 10 your own, or must you get a referral from an SCDC
> 11 doctor?
> 12 A I have to get a referral from SCDC.
> 13 Q Can you tell me about the -- the process about you
> 14 would get that referral? I think we talked about
> 15 it earlier. I'm wondering if it's electronically,
> 16 or, you know, you get a written form that says, "Go
> 17 see this patient."
> 18 A Right. So, it doesn't come to me directly.
> 19 Q Okay.
> 20 A It goes to the nurses in the SCDC GI Clinic and
> 21 there's a nurse assigned to that clinic. And that
> 22 request goes to her and then she would -- based on
> 23 her schedule -- clinic schedule, she would post the
> 24 patient in the clinic. So the first time I would
> 25 see the patient is in clinic. I would have no
> 1 reference prior to that.
>
> (Dr. Chockalingam Depo. 29-30:9-25;1) (Pltf.'s Exhibit 5)
>
> 11 Q Would you have had any influence to be able to see
> 12 this patient sooner, or would you have had to have
> 13 that referral from SCDC in order to see the
> 14 patient?
> 15 A I would not have known about the patient.
> 16 Q Would you have liked to have seen the patient
> 17 earlier had a referral been sent to you sooner?

7

18 MR. PARHAM: Object to form.
19 MR. MCDOW: Object to the form of the
20 question.
21 A I -- I don't make that decision.

(Dr. Chockalingam Depo. 33:11-21) (Pltf.'s Exhibit 5)

24 Q Now, in your notes from this -- this visit and
25 procedure with Mr. Bynum, would you have requested
1 SCDC to do a follow-up visit from this procedure,
2 or would you have scheduled the follow-up visit
3 after this procedure?
4 A After the procedure, we -- we -- we recommend a
5 follow-up time period and then that information
6 goes back to SCDC and then they would schedule the
7 patient.

(Dr. Chockalingam Depo. 50-51:24-7) (Pltf.'s Exhibit 5)

14 Q Would you generally have put a time frame? I know
15 sometimes you put four-week follow-up, or -- you
16 generally notate some sort of time. So would --
17 what -- what would have been your practice for
18 follow-up visits? Do you generally put a time or
19 sometimes you don't and -- how does that work?
20 A Sometimes we do; sometimes we don't. And I'd leave
21 it up to the staff at SCDC, based on availability,
22 to schedule that patient.

(Dr. Chockalingam Depo. 55:14-22) (Pltf.'s Exhibit 5)

17 Q So after a procedure that you completed, would you
18 inform the patient of the results, or are you
19 dependent upon SCDC to inform the patient of the
20 results?
21 A Dependent on SCDC.

(Dr. Chockalingam Depo. 54:17-21) (Pltf.'s Exhibit 5)

6 Q Do you know why further evaluation was not
7 indicated? Does -- does that mean further
8 evaluation was not indicated by the -- by you after
9 that 12/12/2014 procedure, or is that referring to
10 further eval not being indicated by anyone at SCDC,
11 or do you not know?
12 A Not me.

8

>13 Q And what makes you think that it's not you?
>14 A Because we had a recommendation to follow up.

(Dr. Chockalingam Depo. 85:6-14) (Pltf.'s Exhibit 5)

>2 Q Do you recall if any of the doctors at SCDC who
>3 also were treating Mr. Bynum ever reached out to
>4 you to discuss, you know, a -- a treatment plan or
>5 his symptoms?
>6 A No. Not to me directly, no.

(Dr. Chockalingam Depo. 94:2-6) (Pltf.'s Exhibit 5).

As shown above, the record is full of evidence indicating genuine issues of material fact exist and that SCDC was responsible for follow up appointments, further evaluations, and scheduling of medical visits for Mr. Bynum. All of which, in the opinion of Plaintiff's experts significantly delayed Mr. Bynum's diagnosis.

Fourth, Defendant SCDC's argument that Dr. Eisner cannot give opinions as to the delay of treatment and delay of a referral is unreasonable. For example, a cardiologist may not be able to give his opinions regarding eye surgery, but a cardiologist based on his clinical education and experience, could definitely recognize when a patient needs to be sent for further evaluation and go to an eye surgeon if persistant symptoms exist. Applying that same principle to this case, Dr. Eisner can give his professional medical opinions regarding delay of treatment, delay of referral, when a doctor should recognize signs and symptoms of a patient that need further evaluation, and that doctors should not ignore persistent signs and symptoms of any patient.

Furthermore, all medical doctors go through general medical training and are internists before specialty physicians. Dr. Eisner is no different. Dr. Eisner is still an internist and knows what the standard of care is for this case and is familiar with it. Specifically he states in his report

"he is aware of and qualified to opine on the standards of care applicable to the treatment and care of patients, like Mr. Bynum". He further states that "his opinions are based on his education, training and experience". (See Pltf.'s Exhibit 2- Dr. Eisner's Expert Report). Every medical doctor who treats patients knows and is familiar with the standard that you cannot delay treatment to a patient if persistent signs and symptoms exist for further evaluation. [1]

Dr. Esiner has every capability to opine on the delay of care of Defendant SCDC because he is the type of doctor that Mr. Bynum should have been referred to earlier. It is certainly within his expertise to state opinions regarding the timing of patient care, since he would normally see these types of patients within his field of practice and since any delay in this care would affect how he treats a patient when they come to him. Additionally, the evidence indicates the medical personnel at SCDC see Mr. Bynum with symptoms of GERD and difficulty swallowing. (See Pltf.' Exhibit 1- Medical Encounters). Dr. Eisner also specifically states in his reports he is familiar with the management of patients with symptoms of GERD, difficulty swallowing, and with the diagnosis and treatment of esophageal cancer. (See Pltf.'s Exhibit 2- Dr. Eisner's Expert Report). Dr. Esiner trains primary care doctors on a daily basis regarding GI symptoms and what to look for. This would include the symptoms that the SCDC medical staff were assessing Mr. Bynum with when he presented to sick call for several years. (See Pltf.'s Exhibit 1- Medical Encounters). Therefore Dr. Eisner's is qualified, skilled, and has knowledge to testify on all matters contained in his Report.

Based upon the above, and Dr. Catenacci and Dr. Eisner's' expert opinions that absent the failures of the Defendants an earlier diagnosis would have more likely than not given Mr.

---

[1] See also Pltf.'s Exhibit 4- Dr. Catancci's Affidavit stating "As in this case, it is commonly understood in the medical field that the earlier one is diagnosed and treated, the higher the probability for cure of this cancer and a higher probability for longer survivability."

Bynum a higher probability for long term survival, the Plaintiff has established deviations form the standard of care and proximate cause. (See Pltf.'s Exhibit 2- Dr. Eisner's Expert report; Pltf.'s Exhibit 3- Dr. Catenacci's Expert Report; Pltf.'s Exhibit 4- Dr. Catenacci's Affidavit). There is evidence that an earlier cancer diagnosis should have occurred in 2013 or shortly thereafter making Mr. Bynum's probability for long term survival greater than indicated by the Defendants. (See *Id.*). Unfortunately due the delays in treatment and deviations from the standard of care by the Defendants, Mr. Bynum was not diagnosed until his cancer progressed to Stage IV. However if timely caught Mr. Bynum's stage level would have been lower and the probability of survival would have been greatly increased, as opined by Dr. Catenacci. (See generally Pltf.'s Exhibit 4).

Therefore the Plaintiff has established genuine issues of material fact exist and that there is evidence that the Defendants' failures proximately caused Mr. Bynum's death. Put more simply there is evidence that different conclusions, other than those presented in Defendants Motion, can be drawn from the record making summary judgment improper.

### III. NOTWITHSTANDING THE ABOVE, SUMMARY JUDGMENT MUST NOT BE DECIDED UNTIL THE PLAINTIFF HAS HAD A FULL AND FAIR OPPPORUNITY FOR DISCOVERY.

Notwithstanding the above, summary judgment must not be granted until the Plaintiff has had a full and fair opportunity to complete discovery. Thus granting the Defendants summary judgment, at this time, would be inappropriate as the answer to this question is still currently pending before the Court. Plaintiff has not had a full and fair opportunity to fully develop the record as previously briefed in ECF's 54-Plaintiff's Motion to Compel and 55-Plaintiff's Motion for Extension of the Scheduling Order. In ECF's 54 and 55 the Plaintiff specifically outlined all the hurdles he has faced during the discovery period in this case and all outstanding discovery

11

needed. The Plaintiff has pointed to several actions by the Defendants to block the Plaintiff from: (1) receiving relevant discovery including images of Mr. Bynum's scans and procedures and (2) taking properly noticed depositions within the discovery timeframe. Additionally Plaintiff's expert, Dr. Eisner, noted in his expert report that he did not have all the images available to be able to make all his critical determinations against the Defendants in this case and as such would like to supplement his report regarding the deviations of care once received. (See Pltf.'s Exhibit 4- Dr. Eisner's Expert report). The Plaintiff is still currently waiting on all images for Mr. Bynum's scans to be turned over by the Defendants. Therefore, further inquiry into the facts of this case is required and summary judgment is not appropriate. (See e.g. Schmidt et.al v Courtney et.al, 357 S.C. 310, 592 S.E.2d 326 (Ct. App. 2003) (finding the trial court erred in granting the Defendant's Motion for Summary Judgment when more time was needed in discovery). Therefore, and in the alternative, summary judgement must not be decided until Plaintiff's Motion to extend the discovery phase is ruled upon.

## CONCLUSION

This is a case in which the record consists of ample evidence, including deposition testimony, medical records, and expert opinions to allow several reasonable inferences thus requiring the determination of proximate cause to be one for the jury. Further, the Plaintiff argues further inquiry into the facts of this case is required and thus summary judgment is not appropriate because he has not had a full and fair opportunity to complete discovery. Therefore, for all the reasons stated above, Defendants Motion for Summary Judgment must be denied.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | **BELL LEGAL GROUP, LLC** |
|  | *s/ J. Edward Bell, III* <br> J. Edward Bell, III, Federal ID 1280 <br> Gabrielle A. Sulpizio, Federal ID 12715 <br> BELL LEGAL GROUP <br> 219 N. Ridge Street <br> Georgetown, SC 29440 <br> TEL: (843) 546-2408 <br> FAX: (843) 546-9604 |
| April 16, 2019 | ebell@edbelllaw.com |
| Georgetown, South Carolina | **ATTORNEY FOR THE PLAINTIFF** |

13